## HERZ & Co. *et al. v.* UNITED STATES (No. 1424).[1]

INSULATORS FOR SPARK PLUGS MADE OF GERMAN LAVA.

There appears to be no real conflict between the record in the Kraemer case, Abstract 30481 (T. D. 32943), and the testimony in United States *v.* Morris European & American Express Co. (1 Ct. Cust. Appls., 300; T. D. 31356). The sample in the present case was stipulated as the same with that in the two named cases. Proof that an article is talc does not disprove the collector's return that the article is porcelain; and no satisfactory disproof of return in this case having been made, its correctness stands unimpeached.

### United States Court of Customs Appeals, March 3, 1915.

APPEAL from Board of United States General Appraisers, Abstract 35775 (T. D. 34521).

[Affirmed.]

*Allan R. Brown* for appellants.

*Bert Hanson,* Assistant Attorney General (*Charles E. McNabb,* assistant attorney, of counsel), for the United States.

Before MONTGOMERY, SMITH, BARBER, DE VRIES, and MARTIN, Judges.

DE VRIES, Judge, delivered the opinion of the court: :

Appeal from two decisions of the Board of General Appraisers, covering a number of protests affecting importations of insulators for spark plugs assessed as and held by the collector to be "undec-

---

[1] Reported in T. D. 35192 (28 Treas. Dec., 339).

orated porcelain." These protests were submitted before the Board of General Appraisers upon records made in two other cases, the sample therein, and a stipulation that the sample herein is substantially the same as that the subject of decision in those two cases. In each case the board states:

The testimony in United States *v.* Morris European & American Express Co. referred to * * * was taken before the Board of United States General Appraisers in January, 1910, and decided by that tribunal in April, 1910. The testimony in the case of F. L. Kraemer & Co., 577230, was taken before the Board of United States General Appraisers in May of 1912, and decided by that tribunal in November, 1912. The importer interested in the classification was not the same in the several cases, nor was the attorney representing the importer, and the conclusion reached by the Board of General Appraisers in the one case was different from that reached by the Court of Customs Appeals in the other. In Kraemer's case the Government offered no testimony and the decision was based largely upon the analysis of the material made by the Government chemist. In the Morris European & American Express Co. case elaborate testimony was offered by the importer, also by the Government. Taking the testimony in the two cases together they present an irreconcilable conflict. Upon such a record we are unwilling to attempt to definitely determine the classification of the merchandise in question. The protest is therefore overruled without affirming the action of the collector.

A close examination of the records in these cases fails to convince us that "taking the testimony in the two cases together they present an irreconcilable conflict." This allusion, of course, refers to the testimony and not the conclusions of law in the respective cases. In neither case was the record in a satisfactory condition, and in both cases it is apparent that a more satisfactory record could have been presented to the board and this court to the end that the issue presented might have long since received a final determination. There is sufficient, however, in these records to make it certain that these importations are insulators for spark plugs made of a material commonly known as German lava, which is susceptible of chemical analysis and has been so analyzed.

The first case was that of Morris European & American Express Co. (1 Ct. Cust. Appls., 300; T. D. 31356). The record in that case, as stated, is made a part of the record in these cases. There was no chemical analysis admitted in evidence in that case, and the exact composition of the material out of which the spark plugs were made was the subject of considerable testimony. The appraiser had reported to the collector and the collector had decided and returned to the board that "*the spark-plug insulators consist of undecorated porcelain.*" At the hearing before the board two witnesses testified upon behalf of the importers. One of them, Mr. Gustav L. Herz, of the appellant firm in this case, testified that the merchandise was made of mineral lava; that the material from which these articles were made was "mellilite"; "mellilite is a form of lava"; that it was "made *out of* the mineral called lava"; "that he had tried to make them

out of the crude material, but could not because of the want of experience." The next witness, Mr. Moritz Kirchberger, was the only witness who testified in the case who seemed to possess any positive or satisfactory knowledge of the real component materials of the imported article. He testified:

Q. What is that?—A. The commercial name under which this has been known for the last 40 or 50 years is lava, a chemical composition, the result of magnesia and water.

      *         *         *         *         *         *         *

Q. You described this as an article made out of the material called German lava?—A. Yes, sir; that is the principal part.

Q. Do you mean to say this article is cut out of lava, pieces of so-called German lava, or is it made as a composition of something having German lava in it?—A. It is a composition.

Q. And it has other materials besides lava?—A. It has other materials besides lava.

Q. Is it subjected to any process of turning or molding in any way to get it into its present form?—A. Why, yes.

Q. It is?—A. It is.

Q. Is it fired after that?—A. It is.

Q. Do you know what that other material is?—A. It is some oxide of magnesia in there, and there are some alkalies put in there, and, I don't know, a few other things. The main substance is the waste material they bring in from the factory.

Q. (By Judge SOMERVILLE.) What is the article of chief value, if you know?—A. The chief value is the silicate of magnesia, this here Exhibit B, in a crushed and ground state.

      *         *         *         *         *         *         *

Q. Coming back to what you said about the way the Exhibit 1 is made out of ordinary German lava, look at this Exhibit F. That is a powdered state of German lava?—A. It is not yet crushed, it is just the pure waste; and this again will be crushed, to be used at all, be crushed further. It is the pure waste as it falls off the pieces when they are sawed.

Q. Exhibit 1 is made out of the Exhibit F, with the addition of the other materials you have mentioned?—A. With the addition of the other materials I mentioned.

Q. Is it necessary to prepare the body with any degree of care?—A. I think that somebody ought to know somewhat about it to do it properly.

Q. You know about the way it is made?—A. I have seen them make it; it looks very simple.

Q. After it is drilled I understand you to say it is fired?—A. It is fired.

Q. In the same kind of kilns as the porcelain is fired in?—A. I have never seen porcelain fired.

Q. (By Judge WAITE.) Is that made in a mold?—A. These are made in a mold; yes, sir.

      *         *         *         *         *         *         *

Q. To your knowledge, the only term or name which has been applied to the Exhibit C commercially all the years you have been acquainted with it is "lava"?—A. Not only. It has another name, "withamite," which the manufacturer frequently gives it and which is occasionally used.

Q. Is it not a fact that this name "lava" as applied to the Exhibit C is the name applied by you alone, or have you heard it applied by others?—A. That name is applied by anyone who handles that class of goods.

It is made clear from the record that Mr. Kirchberger's testimony as to chief value referred to quantity and not to price.

The Government in that case introduced a record wherein several witnesses testified that insulators for spark plugs in this country were made of porcelain.

Upon this record the Board of General Appraisers made no finding of fact, but stated "from the testimony it is apparent that it is not lava, but exactly what the substance is or what is added to it in the manufacture of these articles in question is not distinctly shown." The board thereupon proceeded to decide the case upon the assumption that the articles were porcelain, holding, however, that they were not within the provisions of paragraph 97 of the tariff act of 1897 for the reason that they were not decorated. Upon appeal to this court the same assumption was made by the court, to wit, that the articles were porcelain and the case decided upon the point of law involved in the statement that "the material obviously being within the subject of paragraph 96, *the only issue in the case* is whether or not the article as imported is susceptible of decoration." A careful review of the fragmentary testimony in that case is convincing that this court could have taken no other view upon the record. The importers were in court controverting and seeking to overthrow the decision of the collector made upon the report of the appraiser that the articles were "undecorated porcelain." The decision was presumptively correct and the burden was upon the importers to disprove the same. The importers' testimony not only did not disprove or overthrow the presumption attending the correctness of the return of the collector, but tended under the accepted authorities to support it. Aside from the testimony that the merchandise contained large quantities of silica there was the positive statement of the importers' witness that it was withamite. Withamite is epidote, which is a silicate aluminum, iron, and calcium, well-known porcelain components. See "A Treatise on Ceramic Industries," by E. Bourry (p. 50). As found by the board there was no testimony disproving the collector's return.

The case of Kraemer, Abstract 30481 (T. D. 32943), referred to in the board's opinion, was a board case. But one witness was called. The collector had returned upon the report of the appraiser that the merchandise was "undecorated porcelain." The following questions and answers followed:

Q. (By Mr. Brown.) Are you familiar with the material out of which the insulator is made?—A. Yes, sir.

Q. What is it?—A. It is a soapstone composition.

Q. The Government says lava composition?—A. It is called lava in the trade, the same as the gas burners are called lava tips.

Q. It is not the real lava that comes from the volcano?—A. No. In fact, it is soapstone.

Q. (By Mr. Robertson.) What do you really know about the material—how are you able to state what you have just told Mr. Brown?—A. These insulators are made by the same people who make the gas burners, the so-called lava burners.

Q. Yes; but what I want to know is how you personally know that this is made from the material you mentioned. I think you said soapstone, did you not?—A. Yes.

Q. How do you know that?—A. I learned it from the manufacturer.

Q. That is the only information you have?—A. Yes.

This testimony, as stated, was hearsay. Nevertheless, as we shall hereafter see, it is not in conflict with the assumption of the court and board or the testimony in the Morris European & American Express Co. case. A sample of the merchandise was then admitted in evidence and submitted to the chemist at the United States laboratory, appraiser's office, New York, N. Y., who reported that it consisted of "silica, magnesia, iron oxide, alumina, traces of lime. Constitutes talc." This analysis came into the record upon an express reservation by the Government counsel that an opportunity should be afforded to cross-examine the Government chemist as to this report. No such examination, however, was ever had and the board was left with the hearsay testimony stated, and the analysis and collector's decision to determine the facts in the case. There was nothing in this record not reconcilable with the decision of the collector.

The same testimony and the same report, without any further elucidation for the benefit of either the board or this court, appear in this record.

In the light of well accepted authorities not only the enumerated elements of this sample, but talc, are all of the essential materials from which porcelain is made. And, as we view it, both records are for reasons hereinafter given reconcilable with the view that the composition of this importation is porcelain. Nor does this concede that they are not stoneware within the statute.

As we have stated the analytical components of the sample in the Kraemer case, which it is here stipulated is the same as the sample in this case, whether they be as enumerated or as constituting talc can be and are used in the manufacture of porcelain. It follows that the naked proof of the fact that an article is talc, or of these components, does not disprove the return of the collector that an article is porcelain. The highest authorities upon the subject of porcelain agree with and support this statement. Thus the well-recognized authority, Bourry, in the work entitled "A Treatise on Ceramic Industries," at page 33, in his classification of various raw materials used in ceramics, speaks of " (a) materials *similar to clay* which can be substituted for it *either entirely or in part*," and enumerating therewithin "talc or steatite * * * found in the soft friable rock, of slight plasticity. * * * It has been employed for the manufacture of large ceramic vases. Magnesite has been used in Spain for the manufacture of porcelain." And, further (p. 52), in speaking of the plastic bodies, talc again appears as a composition

in the manufacture of ceramics. Likewise, at page 179, where the firing is treated of in the making of ceramics and the requisite temperature for the various materials so used, talc is enumerated. More exactly to the point is the Dictionary of Applied Chemistry, by Thorpe (vol. III), wherein, speaking of steatite, it is defined as—

A massive or schistose variety of talc, more or less impure, known popularly, from its unctuous feel, as *soapstone.* * * * *Steatite is sometimes used in the manufacture of porcelain,* and the veins of the mineral in the serpentine of the Lizard, in Cornwall, were formerly quarried for supplying the china works of Bristol.

So that it is made obvious from the proof in the record and these highly accepted authorities that the showing in these cases against the returns of the collector that this merchandise was porcelain not only did not controvert but corroborated the returns. Particularly is it true that in the Kraemer case the record did not necessarily conflict with the testimony in the Morris European & American Express Co. case, nor did it in any substantial way dispute the conclusion reached in that case, but rather tended to affirm it.

So far as shown, therefore, by this record, no satisfactory disproof of the collector's return having been made, its correctness must stand as unimpeached, and, since the decision of the board does not disturb it, that decision is *affirmed.*